IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | CRIMINAL CASE NO. 08-00041 |
| )  Plaintiff, ) | |
| ) vs. ) | |
| ) | **ORDER** |
| MICHAEL J. GOMBAR, ) | Denying Motion to Suppress |
| ) Defendant. ) | |

This matter is before the court on the Defendant's motion to suppress. The court held evidentiary hearings on November 21, 2008, and December 2, 2008. Upon review of the testimony and evidence adduced at the hearing and giving due consideration to the parties' argument and applicable caselaw, the court hereby issues the following Order denying the motion to suppress.

## FACTUAL FINDINGS[1]

The Government's first witness was Master at Arms 2 ("MA2") Paul Szilagyi, who was currently assigned to the Naval Base Guam Security Department. He explained that a Master at Arms was essentially a military police officer capable of conducting all aspects of law enforcement, that is enforcing rules and regulations on naval installations. MA2 Szilagyi joined the United States Navy in May 2000 and was promoted to Master at Arms in August

---

[1] To the extent that a finding of fact should be deemed a conclusion of law, or a conclusion of law deemed a finding of fact, it shall so be considered and incorporated.

United States of America v. Michael J. Gombar, Criminal Case No. 08-00041
Order Denying Motion to Suppress

2004. MA2 Szilagyi testified that as part of his training and background to become a Master at Arms, he underwent a six-week training course in San Diego, California known as A school, which was taught by the San Diego Sheriff's Department and a retired FBI agent. There he learned about force protection (*e.g.* people running through security gate), base violations, enforcement of rules and regulations, traffic stops and accidents, handling people suspected of driving under the influence, and various other aspects of law enforcement. MA2 Szilagyi also learned about three field sobriety tests ("FSTs") – the one leg stand, the nine step walk and turn, and the horizontal gaze nystagmus – and how to administer them. He stated that he was taught to look for certain characteristics when administering the FSTs which would tend to indicate that an individual was under the influence of alcohol. While stationed at Naval Air Station Lemoore, MA2 Szilagyi stated he underwent training and refresher courses on FSTs every year.

MA2 Szilagyi testified that in June 2008[2] he was standing watch at the main gate to Naval Base Guam. The main gate had a sign posted which stated that all persons are subject to searches of their persons and items within their control. Additionally, another sign warned that all persons are subject to a sobriety check. At about 6:00 a.m., a red Pontiac Grand Am approached and stopped. MA2 Szilagyi noticed there were three individuals in the vehicle, with the Defendant in the driver's seat. MA2 Szilagyi asked the Defendant for his military identification,[3] and the Defendant stated he did not have a military ID card but requested permission to drop the two naval officers in the vehicle off at a visiting ship.

---

[2] MA2 Szilagyi could not recall the exact date when the incident in question occurred. At one point during direct examination, he testified that the incident occurred on June 5, 2008, but was later apprehensive about this date after he was presented with certain exhibits listing an incident date of June 30, 2008. The Government's third witness, Joseph Charles Quidachay, who was responsible for the final review of the incident report, clarified that it was an "oversight" on his part for failing to correct the discrepancy between the June 5, 2008 date noted in the narrative portion of the Incident Report and the June 30, 2008 date which appears everywhere else. Based on this explanation and the exhibits presented, the court finds that the incident in question actually occurred on June 30, 2008.

[3] MA2 Szilagyi testified that Naval Base Guam policy requires 100% identification check of all individuals entering the base.

page 2 of 10

Case 1:08-cr-00041   Document 30   Filed 01/21/09   Page 2 of 10

During this exchange, MA2 Szilagyi noticed that the Defendant's eyes appeared watery and bloodshot. The Defendant was slouched in his seat in what MA2 Szilagyi described as "a relaxed state." MA2 Szilagyi testified that he smelled an odor of what could have been an alcoholic beverage coming from the vehicle.

MA2 Szilagyi then leaned in closer to talk to Defendant, and smelled the same odor coming from the Defendant's breath as he spoke.[4] MA2 Szilagyi asked the Defendant if he had had anything to drink that evening,[5] and the Defendant replied that he had a couple of beers.[6]

---

[4] Defense counsel argued that MA2 Szilagyi smelled the odor associated with alcoholic beverages coming from the interior of the car and not the Defendant's breath. Defense counsel asserted that although the narrative portion of the Incident Report (Defense Exhibit A) noted "a strong odor of alcohol emanating from his vehicle," the Incident Report never states that MA2 Szilagyi detected this same odor coming from the Defendant's breath or person.

MA2 Szilagyi testified that he included this observation in his report. The court believes MA2 Szilagyi's testimony, and finds support for such in the Alcohol Incident Report (Defense Exhibit E), where MA2 Szilagyi checked off box 4 indicating "odor of alcoholic beverage" when MA2 Szilagyi had "Personal Contact" with the Defendant. Furthermore, the citation issued to the Defendant (Defense Exhibit F) states that MA2 Szilagyi observed the Defendant "with watery bloodshot eyes and the odor of an alcoholic beverage emitting from his person."

[5] MA2 Szilagyi testified that this is a standard question he usually asks.

[6] MA2 Szilagyi testified that he distinctly remembers the Defendant making this statement and that he included such statement in his original written report. Upon review of the incident report, however, MA2 Szilagyi surmised that perhaps the admission was missing because the report had been "chopped" or altered by one of the two individuals who reviewed his report as part of the "QC process." These two individuals (Scott Whaley and Joseph Quidachay) stated that they merely review and revise incident reports for spelling and grammatical errors, but neither individual deleted a provision that related to the Defendant's admission to consuming a couple of beers.

MA2 Szilagyi testified about the process utilized in generating a written report by the Naval Base Guam Security Department. At that time, an initial report is generated in the system by a patrol man. It is then sent to the watch commander for review and editing, and then to the operations captain for final approval. At no time in this process is the initial patrol man able to review his report once it has been finalized. In fact, although MA2 Szilagyi's name appears on Section X of the Incident Report (Defense Exhibit A), another employee actually signed off on the report. MA2 Szilagyi never saw or signed the report after he had sent it to his watch commander, Scott Whaley.

In spite of this discrepancy, the court believes MA2 Szilagyi's testimony that the Defendant made such an admission. MA2 Szilagyi had no personal grudge against the Defendant that would cause him to "make up" such a statement. The court had the opportunity

1  MA2 Szilagyi then asked the Defendant if he would consent to taking FSTs, and the Defendant
2  agreed. MA2 Szilagyi instructed the Defendant to put the vehicle on park, turn the vehicle off,
3  set the keys on the dashboard, and exit the vehicle. The Defendant did as instructed, and, as he
4  stepped out of the vehicle, MA2 Szilagyi noticed that the Defendant still had bloodshot, watery
5  eyes, and he could smell the same alcoholic beverage-like odor on the Defendant's person that
6  he had initially detected coming from within the vehicle.

7  MA2 Szilagyi first administered the one leg stand test. He explained the instructions to
8  the Defendant and then watched the Defendant perform the test. MA2 Szilagyi noticed that the
9  Defendant did not keep his arms down at his side as instructed, and he had to use his arms to
10 help keep his balance while performing the one leg stand test.[7]

11 MA2 Szilagyi then instructed the Defendant on the nine step walk and turn test. He
12 observed no unusual indicators from the Defendant during the performance of this test.

13 MA2 Szilagyi did not administer the horizontal gaze nystagmus test.[8] He explained that
14 although this test was, in his experience, the most reliable of the three FSTs, he believed that
15 administering the horizontal gaze nystagmus test was not necessary under the circumstances.

16 Based on his observations, MA2 Szilagyi suspected the Defendant had been driving

---

to view MA2 Szilagyi personally as he testified. His recollection of the events was clear, and MA2 Szilagyi responded to questions posed during direct and cross examination without hesitation. The court finds his testimony to be credible despite the fact that the Defendant's admission to consuming a couple of beers was not included in the written reports.

[7] MA2 Szilagyi acknowledged that while the Defendant was performing the FSTs, there were many cars passing on either side of the Defendant. He further testified that between 6:00 and 8:00 a.m., there could be 1,500-1,600 cars passing through the main gate of Naval Base Guam. While the passing traffic could have affected the Defendant's performance on the one leg stand test, the passing traffic can not explain away the other observations that led to MA2 Szilagyi's suspicions that the Defendant was under the influence of alcohol.

[8] Defense counsel questioned why MA2 Szilagyi placed a "Ø" mark (zero with a slash line drawn through it) in the box labeled "Total Clues" by the Horizontal Gaze Nystagmus portion of Section III of the Alcohol Incident Report (Defense Exhibit F). Defense counsel argued that if MA2 Szilagyi did not administer this test as he testified, then he should have just left this part blank. The court believes the live testimony of MA2 Szilagyi that he did not administer this particular HGN and accepts the explanation provided by him.

under the influence of alcohol, so he inquired whether the Defendant would agree to take a breath test. The Defendant agreed, and he was thereafter detained and transported to the security headquarters, where a breath test was administered to him. The Defendant was then issued a citation[9] and escorted off the naval base.

## CONCLUSIONS OF LAW

The Defendant asserts he was arrested without probable cause and thus seeks suppression of all physical evidence and statements – specifically the results of the breath test – derived from the allegedly unlawful arrest.

The Fourth Amendment prohibits *unreasonable* searches and seizures by the Government. The Supreme Court imposes a presumptive warrant requirement for searches and seizures, and generally requires probable cause for a warrantless search or seizure to be reasonable. See Ornelas v. United States, 517 U.S. 690, 693 (1996) ("warrantless search of car is valid if based on probable cause"); United States v. Watson, 423 U.S. 411 (1976) (warrantless arrests based on probable cause are reasonable under the Fourth Amendment). Probable cause to conduct a warrantless arrest exists when police have, at the moment of arrest, knowledge of facts and circumstances grounded in reasonably trustworthy information and sufficient in themselves to warrant a belief by a prudent person that an offense has been or is being committed by the person to be arrested. Beck v. Ohio, 379 U.S. 89, 91 (1964).

However, an exception to the probable cause requirement is recognized for an investigatory detention – often referred to as a Terry stop – wherein police may temporarily detain an individual, question him briefly, and perform a limited pat-down frisk for weapons based upon reasonable suspicion. See Terry v. Ohio, 392 U.S. 1, 22-24 (1968). Reasonable suspicion has been defined to mean a combination of "specific and articulable facts which, if taken together with rational inferences from those facts" reasonably suggest that criminal

---

[9] MA2 Szilagyi testified that the date he issued the "DD 1805 Violation Notice" was the same date he detained the Defendant. A review of the Defense Exhibit F (the DD 1805 Violation Notice actually issued to the Defendant) reveals an issuance and incident date of June 30, 2008. This further supports the court's finding that the incident occurred on June 30, 2008, and not on June 5, 2008. See footnote 2 *supra*.

activity has occurred or is about to occur. Id. at 21. A case-by-case analysis is required to determine whether the police had reasonable suspicion, and courts look to the "totality of the circumstances" which surrounded the encounter. United States v. Cortez, 449 U.S. 411, 417 (1981).

In this case, the Defendant was required to come to a stop when he approached the main gate to Naval Base Guam so that the sentry guards could determine whether he had a right to access the base. The court finds that this encounter – the initial stop – was an not an "unreasonable seizure" in violation of the Fourth Amendment.

The Supreme Court has stated that "[t]he touchstone of the Fourth Amendment is reasonableness. The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." Florida v. Jimeno, 500 U.S. 248, 250 (1991) (citations omitted). In Brown v. Texas, 443 U.S. 47 (1979), the Supreme Court held that:

> The reasonableness of seizures that are less intrusive than a traditional arrest depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty.

Id., at 50-51 (citations omitted).

To this end, the Ninth Circuit has held that a warrantless stop of a vehicle attempting to enter a military base was reasonable and did not violate the Fourth Amendment. See United States v. Hawkins, 249 F.3d 867 (9th Cir. 2001). The Ninth circuit recognized that "[t]he Government's interest in maintaining national security and promoting public safety on base roadways outweighed the brief and limited intrusion resulting from stopping [the defendant] at the . . . gate." Id. at 875.

The same is true here where the Defendant made the conscious decision to drive up to the main gate leading to Naval Base Guam. There were visible signs posted warning those who approached that all persons were subject to search and subject to sobriety checks. Thus, the Defendant was aware that he would be required to stop at the gate before being allowed entry.

Such a brief stop is reasonable under the circumstances and does not violate the Fourth Amendment.

During this initial encounter, MA2 Szilagyi made certain observations of the Defendant. MA2 Szilagyi noticed the Defendant's eyes appeared bloodshot and watery. Additionally, MA2 Szilagyi smelled an odor of what could have been an alcoholic beverage coming from the interior of the vehicle. When MA2 Szilagyi leaned in closer to talk with the Defendant, he detected this same alcohol-like odor coming from the Defendant's breath. Furthermore, when asked if he had had anything to drink, the Defendant stated that he had a couple of beers. These observations led to the subsequent request that the Defendant step out of the vehicle to perform field sobriety tests. Thus, the next issue for the court is whether this brief detention to permit MA2 Szilagyi to conduct filed sobriety tests on the Defendant was reasonable.

> Requiring a driver to submit to a field sobriety test constitutes a seizure within the meaning of the Fourth Amendment. Courts have generally held that the intrusion on the driver's liberty resulting from a field sobriety test is minor, and the officer therefore need only have reasonable suspicion that the driver is under the influence of alcohol in order to conduct a field sobriety test.

U.S. v. Hernandez-Gomez, 2008 WL 1837255, 4 (D. Nev. 2008) (*citing* Vondrak v. City of Las Cruces, 2007 WL 3319449, 8 (D. N.M. 2007)).

In this case, MA2 Szilagyi had reasonable suspicion to believe that the Defendant was under the influence of alcohol. As stated previously, MA2 Szilagyi saw that the Defendant's eyes were bloodshot and watery. He also smelled a strong odor associated with alcoholic beverages coming from the interior of the car, the Defendant's breath, and from his person when stepped out of the vehicle. While the court recognizes that the alcohol-like smell can be attributed to the two inebriated passengers in the vehicle, when asked whether he had had anything to drink the Defendant admitted to having had a couple of beers. While the Defendant contests such a statement, the court finds this testimony by MA2 Szilagyi to be credible. MA2 Szilagyi stated that this was a standard question he usually asked those he suspected of being under the influence of alcohol. Based on these specific and articulable facts, it was reasonable for MA2 Szilagyi to suspect that the Defendant was possibly driving under the influence of alcohol. Accordingly, it was not unreasonable to require the Defendant to step out of the vehicle

in order to submit to field sobriety tests.

During skillful cross examination by counsel, MA2 Szilagyi conceded that the Defendant was cooperative and responsive to questions posed to him prior to the performance of the FSTs. MA2 Szilagyi had no concerns about the Defendant's ability to understand the questions posed or instructions given. Defense counsel argued that because the Defendant was alert and responsive, this should have alleviated MA2 Szilagyi's concerns that the Defendant was intoxicated. Although the Defendant could comprehend and speak clearly, MA2 Szilagyi still believed the FSTs were necessary given his initial observations of the Defendant, such as the bloodshot, watery eyes, and the Defendant's admission that he had consumed a couple of beers. The court concurs with and finds nothing improper in MA2 Szilagyi's decision to administer the FSTs, based on his training and experience. A police officer "is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also 'be grounded in objective facts and be capable of rational explanation.'" United States v. Lopez-Soto, 205 F.3d 1101, 1105 (9th Cir. 2000) (*quoting* United States v. Michael R., 90 F.3d 340, 346 (9th Cir.1996)). Furthermore, the Defendant was not detained for a long period of time while the FSTs were being administered. In fact, the Defendant himself agreed to take the FSTs. The FSTs did not involve a major intrusion on the Defendant's liberty interests, and the court concludes that it was not unreasonable for MA2 Szilagyi to further detain the Defendant in order to administer the FSTs.

The court concludes that MA2 Szilagyi had the necessary training and experience to administer FSTs, and his description of how he administered two of the three FSTs on the Defendant appear consistent with the requirements of said tests. While the Defendant was able to perform the nine step walk and turn test without exhibiting any clues that would tend to indicate that he was under the influence of alcohol, MA2 Szilagyi testified that the Defendant did not keep his arms down at his side as instructed and he had to use his arms to help keep his balance while performing the one leg stand test. Based on the totality of the circumstances – the observation of the Defendant's bloodshot and watery eyes, the detected smell of an alcohol-like odor coming from the Defendant's breath and person, the Defendant's admission to having

consumed a couple beers, and the failure to perform the one leg stand test as instructed – the court finds there was more than sufficient probable cause to further detain the Defendant for being under the influence of alcohol, and to then transport him to security headquarters for a breath test. This warrantless arrest[10] was not based on MA2 Szilagyi's mere suspicions but on the facts and circumstances as he observed them to be that led him to reasonably believe that the Defendant was under the influence of alcohol at the time.

Although the report generating process utilized by the Naval Base Guam Security Department could be improved, the court can not conclude that any deficiencies in this process rendered MA2 Szilagyi's in court testimony less credible. For instance, MA2 Szilagyi did not have the opportunity to review and sign off on the final report after it had been reviewed by his watch commander and the operations captain. Nevertheless, the court can not conclude that the allegations contained in Incident Report are somehow more credible than the facts testified to by MA2 Szilagyi. Additionally, the Detailed History for Police Call (Defense Exhibit K) suggests that MA2 Szilagyi did not make the initial stop of the vehicle nor did he conduct the FSTs. This is clearly contradicted by MA2 Szilagyi's testimony and Defense Exhibits A, E, and F. MA2 Szilagyi testified that Exhibit K is prepared by the dispatchers who track the movement of individuals as patrol officers call it in to the dispatch center. He further stated that he had no control over the times contained therein or its accuracy. Officer Whaley stated that the times on the log should coincide with those noted in the Incident Report (Defense Exhibit A). Officer Whaley surmised that Exhibit K was probably incorrect. The court, too, agrees and concludes that Defense Exhibit K does not render MA2 Szilagyi's recollection and testimony about the incident less credible. The court will not discount the live testimony of MA2 Szilagyi based on the internal administrative problems with the report generating process.

Finally, although the Amended Information (Docket No. 24) charges the Defendant with

---

[10] The court recognizes that the word "arrest" is a term of art. Although MA2 Szilagyi stated that he could not "arrest" a civilian and thus merely "detained" the Defendant, the court finds that for all practical purposes, the Defendant was "arrested" when he was transported in restraints to the security headquarters to take a breath test.

having committed this offense "on or about June 5, 2008," the court concludes that the fact that the incident actually occurred on June 30, 2008, is not fatal to Amended Information. The Ninth Circuit has held that "where time is not an essential ingredient of the offense, it is sufficient to charge facts which show that the offense was committed within the statutory period of limitation and in such a case, even though there be a defect in the allegation as to time, it is one of form only." Arnold v. U.S., 336 F.2d 347, 353 (9th Cir. 1964), *cert. denied*, 380U.S. 982 (1965). In this instance, the court concludes that the date is not an essential element of the offense of Driving Under the Influence of Alcohol, and the offense was brought within the statute of limitation. Accordingly, the United States may file a second amended complaint to correct the date alleged. This slight variance in form will not prejudice the Defendant.

## CONCLUSION

The court finds that there was ample probable cause to warrant the detention of the Defendant for further investigation and transportation to security headquarters for the administration of a breath test. Having so found, and because the Defendant raises no other challenge to the breath test, the court hereby DENIES the motion to suppress. No later than January 26, 2009, the Government shall file a second amended complaint to allege the correct date of this incident. The court shall set this matter for a status hearing on Tuesday, January 27, 2009, at 9:45 a.m. for purposes of setting a trial date herein.

IT IS SO ORDERED.



**/s/ Joaquin V.E. Manibusan, Jr.**
**U.S. Magistrate Judge**
**Dated: Jan 21, 2009**